73 So.2d 533

## PRITCHETT v. WADE et al.

### 7 Div. 134.

Supreme Court of Alabama.

June 17, 1954.

A. L. Crumpton, Ashland, for appellant.

158

Walter J. Merrill, Knox, Jones, Woolf & Merrill, Anniston, for appellees.

GOODWYN, Justice.

Appeal from final decree dismissing bill in equity.

Appellant, complainant below, seeks by his bill to enjoin appellees, respondents below, from (1) depositing on complainant's lands waste materials from an iron ore washing plant and (2) from erecting an additional "muck pond" on complainant's lands. The bill also seeks damages for the injury already done.

In substance, the bill alleges the following: That complainant owns the NW¼ of Sect. 29 and the S½ of SW¼ of Sect. 20, Tp. 17 S, R 9 E, in Cleburne County; that he owned that part of Section 20 on and prior to June 10, 1948; that he acquired the lands in Section 29 "about ten or twelve months prior to the filing [on April 25, 1951] of this his bill"; that on June 10, 1948, he joined with his brother, W. B. Pritchett, who then owned that part of the lands lying in Section 29, in executing, as parties of the first part, a contract granting to E. W. York and Republic Steel Corporation, as parties of the second part [being two of the respondents], certain rights with respect to the use of said lands, the said contract, insofar as here pertinent, providing as follows:

"* * * , we, the parties of the first part do hereby grant to the parties of the second part the right to construct and maintain roadways, pipe lines, pumping stations, ditches, telephone and/or light lines across the hereinafter described property [lands above referred to]. Also, the right to construct, maintain and operate a clear water pond upon the same described property. Also, the right to install, maintain and operate a muck pond over an area not to exceed ten (10) acres within the boundaries of the hereinafter described property [lands above referred to].

* * * * * *

"It is known to both parties hereto that the parties of the second part have leased to others the right to construct, maintain and operate a brown ore washing plant on lands of the party of the second part adjacent to the within described lands, and it is the intention of the parties of the first part to grant the parties of the second part the full right to maintain and operate said washing plant and to cross the within described lands of the parties of the first part with the aforementioned roadways, pipe lines, telephone lines, power lines and to install and maintain pumping stations, muck pond, ditches and such other things as are necessary to freely operate said ore mines, and also to use the within described premises for the privileges in mining ore from lands of others than the parties of the second part.

"The within granted privileges to extend for such period of time is [sic] necessary to exhaust the ores from the lands of the parties of the second part, or other lands in the surrounding territory from which ores would normally be washed through a washing plant situated upon the lands of the parties of the second part, and at the end of which time the said rights herein granted shall cease and determine and shall revert to the parties of the second [sic] part.

"We, the parties of the first part, hereby certify that we are the legal and lawful owners of the privileges herein granted, and that we have a good right to sell and grant the same, except as to those reservations in the deed dated June 21, 1946, from the Anniston National Bank, as executor of the last will of William H. McKleroy and Robert B. Kyle and his wife Ruth P. Kyle, to W. B. Pritchett, which deed is recorded in the office of the Judge of Probate of Cleburne County, Alabama, at Deed Record Volume 80, pages 263–264.

"The herein rights and privileges are granted to the parties of the second part, their heirs, administrators, contractors, executors or assigns."

The bill further alleges the following:

"6. Orator further shows that the grantees in said contract entered on the lands described therein, either in person or through their agents or servants, or through their lessee, or sub contractor, or contractor, and among other things, installed or constructed a muck pond which, when full, covered an area of approximately ten acres; that such muck pond consisted of a dam across a valley carrying running water and was used to dump the mud, slush, waste and other such materials from its ore washing machine; that the purpose of such muck pond was to hold the water containing such waste until such waste had settled and the water had become clear and then permit the discharge of such clear water and allot it to travel its normal and natural course.

"7. Orator further avers that these respondents herein named constructed maintained and operated an inefficient dam, a dam which would not and did not hold the aforesaid waste until it had settled, but that permitted such waste matter to flow into the regular and normal run of said stream, and that respondents did discharge, and continue to discharge such waste unto such muck pond knowing that the dam will not hold it and that such waste will pass out of such pond and onto lands situated below such pond.

"8. Orator further avers that a large portion of his land, including the southeast fourth of the southwest fourth of section 20, township 17, south, range 9, east, in Cleburne County, Alabama, which is not described in said above set out grant, lies below said dam aforesaid and is very valuable land; that by reason of the faulty construction, or the faulty maintenance of said muck pond dam, or for both reasons, a large amount of waste has been deposited on orator's said lands and said lands have had their value virtually destroyed thereby, and that respondents continue to permit such waste to be discharged on his said lands and to increase the damage thereto.

"9. Orator further shows that these respondents have started the construction of another muck pond on the above described lands; that they have partially built the dam, have cut and destroyed timber growing on said land, and that such pond, when completed will cover an area of about ten acres; that said respondents have no right or authority to construct such pond or build such dam; that their only authority to construct a muck pond was that given them by the contract above set forth and that such contract authorized them to construct only one such pond and did not authorize the construction of more than one such pond.

"10. Orator further shows that if such last described, or mentioned, muck pond is built the area of the combined ponds so built will exceed ten acres in area and will be illegal for that reason.

"11. Orator further shows that unless the respondents are enjoined, or restrained from so doing, they will continue to build and operate such illegal muck pond and that they will continue to deposit waste from the improperly maintained muck pond already in existence; and will continue to damage orator's property aforesaid."

There was no demurrer to the bill. Respondents answered the bill, in substance, as follows: That they are the holders and owners of the mineral rights in the west half of Section 29, township 17, range 9, Cleburne County, which were reserved in the deed of such lands from Anniston National Bank, as executor, to W. B. Pritchett; that the deed under which they hold conveyed "all minerals, mining rights and privileges, water, flood, overflow and pond rights, in, on and under the West Half of Section 29, Township 17, Range 9 of Cleburne County, Alabama"; that said deed originally conveying said rights was dated March 17, 1947; that two or three months after said date, respondents "constructed an ore washing plant, a muck pond, a clear water pond, pipe lines and other installations, partially on land owned by Republic Steel Corporation and partially on the Northwest Quarter of the Northwest Quarter of Section 29, Township 17, Range 9 in Cleburne County; that after these respondents had operated for several months, W. B. Pritchett made some objection to the use of his land for the washing of ore, which was mined on other property, and complainant C. C. Pritchett made some claim that a small part of the clear water pond was on land owned by him in the Southwest Quarter of the Southwest Quarter of Section 20, Township 17, Range 9 in Cleburne County; that in order to meet these objections by the Pritchetts, forty acres of land were conveyed to W. B. Pritchett and he and complainant C. C. Pritchett then executed the agreement set out in Paragraph Four of the bill of complaint; that the muck pond referred to in said agreement of June 10, 1948, was not then in use and was not then needed; that as the muck pond which was in use at that time, became more and more filled with muck, the respondents began to consult with W. B. Pritchett about the location of the new muck pond which was the muck pond in contemplation of the parties at the time of the execution of said agreement of June 10, 1948; that said W. B. Pritchett objected to the muck pond being placed on his farm land and, during the negotiations about this location of the muck pond, said W. B. Pritchett had his leg shot off by his wife and was unable to be reached for further discussions; that these respondents then undertook the construction of the dam for the muck pond where it is presently being constructed; that the dam for said muck pond is in the Northwest Quarter of said Section 29, and, when completed, there will be less than ten acres of muck pond which was intended and contemplated in said Agreement of June 10, 1948 on the land of the complainant described in the bill of complaint; that the said muck pond now being constructed on the land of complainant is in fact the muck pond referred to in said agreement of June 10, 1948, permission for which was given in said agreement."

The answer also states the following: "The normal operations of these respondents in the mining business affecting the lands of complainant described in the bill of complaint consist of the mining, washing, loading, transporting and delivery of about nine freight cars of ore per day in clear weather. The value of each such car is about $250.00. There is a regular employment of some thirty-five employees in these operations with a weekly payroll of $1,500.00. Much valuable equipment, including eleven trucks, two diesel shovels, one bull dozer and a washing plant, are used in these operations. The respondent, Superior Products, Inc., a corporation, of which respondent R. A. Wade is president and respondent George Vance is Superintendent, is under a contract to furnish the iron ore to respondent Republic Steel Corporation. Much of the ore goes into priority defense

production. Republic Steel Corporation is in need of additional ore and is insisting that this ore be furnished it under said contract."

On the issues thus presented by the bill and answer, testimony was taken orally before the court, after which a decree was rendered dismissing the bill out of court. It is also stated in the decree as follows:

"The bill of complaint being dismissed, the Court makes no determination as to the extent of, or liability for, the damages to the complainant as alleged in said bill of complaint."

The disputed questions of fact relate (1) to the right of respondents to build a muck pond on complainant's lands in the NW ¼ of Section 29, and (2) the extent and nature of damage, if any, to the lands of complainant, particularly the SW. ¼ of the SW ¼, Sect. 20 resulting from respondents' mining operations, that is, whether said damage is such as to warrant the injunctive relief prayed for.

(1) For complainant, it is argued that respondents have no right to build the muck pond on his lands; that neither the conveyance of the mineral rights in said lands nor the agreement of June 10, 1948, can be construed so as to give such right; that the muck pond mentioned in the June 10, 1948, agreement referred to the then existing muck pond on said lands. Respondents' insistence is that it was intended by said agreement to authorize the construction of a new muck pond on said lands; and, further, that the conveyance of the mineral rights authorizes the construction of such pond.

In view of the authorization "to install" a muck pond, thereby importing future action, there can be little doubt, from a consideration of the agreement alone, that the right does not refer to the existing, but rather to a new, muck pond. However, the trial court undoubtedly considered the agreement in this respect to be uncertain and ambiguous, since evidence aliunde was received in aid of construction. Being so considered, such evidence was properly received. Foster & Creighton Co. v. Box, 259 Ala. 474, 66 So.2d 746; Air Conditioning Engineers v. Small, 259 Ala. 171, 65 So.2d 698; Olsson v. Nelson, 248 Ala. 441, 445–446, 28 So.2d 186. The evidence was in conflict. And when, as here, testimony is taken ore tenus before the trial court, the established rule is that a finding by such court on the facts has the effect of a jury's verdict and will not be disturbed on appeal unless plainly and palpably wrong, and contrary to the great weight of the evidence. Gardiner v. Willis, 258 Ala. 647, 648, 64 So.2d 609; Lucas v. Lucas, 258 Ala. 515, 519, 64 So.2d 70. We do not so regard the trial court's findings from the evidence in this case.

In view of our holding with respect to respondents' authority under the agreement, there is no need to discuss their rights under the conveyance of the mineral rights.

(2) A number of witnesses testified concerning the extent of pollution of the stream running through complainant's lands caused by the release of waters from respondents' mining operations, and the nature of the resulting damage to such lands. There was also evidence concerning the effect of the alleged pollution on riparian owners below complainant. Much of the evidence, however, was in conflict, as indicated by the following: That since the mining operations commenced, the stream "has been muddy most of the time"; "muddy all the time"; "is pretty clear now, but at times it is not so clear"; muddy "a good bit of the time"; "I have been there when it wasn't muddy and when it was"; "for a month or so it was pretty muddy, but now it is practically cleared up"; "sometimes the stream is muddy"; that cattle have used the stream for drinking purposes and none has died; that vegetation on land bordering the stream has been covered with mud and other waste material when the stream overflowed its banks; and that this residue stayed on the vegetation until the next rain washed it off.

The record discloses that under normal conditions approximately nine freight cars of ore are loaded per day and the value of the ore in each car is about $250; thirty-five persons are employed in the mining

operations with a weekly payroll of over $1,500; and the company uses eleven trucks, 2 diesel shovels, one bull dozer and a washing plant in this mining endeavor. One of the witnesses for the appellees testified that 250,000 tons of ore had been obtained from this mine and that this ore was a critical defense item.

The question is whether complainant, under the evidence is entitled to injunctive relief against respondents, restraining them from depositing the waste on complainant's lands, specifically, restraining them from emptying the waste into the stream which flows through complainant's lands.

 As a general rule "an injunction, whether temporary or permanent, cannot * * * be sought as a matter of right, but the power to grant or refuse it rests in the sound discretion of the court under the circumstances and the facts of the particular case, * * *." 43 C.J.S., Injunctions, § 14, p. 420; Corte v. State, 259 Ala. 536, 542, 67 So.2d 782, 787; City of Mobile v. Farrell, 229 Ala. 582, 587, 158 So. 539. And in the absence of an abuse of discretion the action of the trial court will not be disturbed on appeal. 5 C.J.S., Appeal and Error, § 1591, p. 485. Particularly is this true where, as here, the facts are in dispute.

██ There is another pertinent principle which recognizes the discretionary authority resting with a court of equity in granting or refusing injunctive relief in cases of this kind. As stated in Martin Bldg. Co. v. Imperial Laundry Co., 220 Ala. 90, 92, 124 So. 82-84:

"In this jurisdiction we recognize, in cases seeking injunctive relief, the 'comparative injury doctrine,' not universally accepted. Brede v. Minnesota, etc., Stone Co., 143 Minn. 374, 173 N.W. 805, 6 A.L.R. 1092. As said by this court in Clifton Iron Co. v. Dye, 87 Ala. 468, 6 So. 192: 'But it is not every case of nuisance, or continuing trespass, which a court of equity will restrain by injunction. In determining this question, the court should weigh the injury that may accrue to the one or the other party, and also to the public, by granting or refusing the injunction.' "

See, also, Montgomery Limestone Co. v. Bearden, 256 Ala. 269, 271, 272, 54 So.2d 571; Elmore v. Ingalls, 245 Ala. 481, 17 So.2d 674.

██ In the light of the foregoing authorities we are unwilling to say that the trial court abused its discretion in denying injunctive relief.

██ The one point remaining for consideration is whether the trial court should have made a determination of the liability for, and the extent and amount of, the damages sought by complainant. We find no error in not so doing. As stated in Yauger v. Taylor, 218 Ala. 235, 238, 118 So. 271, 274:

"The rule is general and well recognized that when an equitable cause is presented, the court will, after granting the equitable relief, proceed to do complete equity, and to that end grant incidental relief which may be awarded at law. But the rule is likewise as firmly settled that if the equitable relief sought is denied, the court cannot retain jurisdiction and grant relief available at law. There must be equitable relief as a basis for supplemental relief."

See, also, Comer v. Limbaugh, 256 Ala. 655, 660, 57 So.2d 72; Lane v. Roma Lumber Co., 234 Ala. 551, 553, 176 So. 283.

From what we have said it follows that the decree dismissing the bill of complaint is due to be affirmed. It is so ordered.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and STAKELY, JJ., concur.